## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>CONCORD COURT AT CREATIVE )<br>VILLAGE PARTNERS, LTD, DBA )<br>CONCORD COURT AT CREATIVE )<br>VILLAGE/AMELIA COURT AT )<br>CREATIVE VILLAGE; SAS CONCORD )<br>COURT AT CREATIVE VILLAGE )<br>MANAGERS, LLC; CONCORD )<br>MANAGEMENT, LTD, DBA CONCORD )<br>RENTS; CONCORD MANAGEMENT )<br>COMPANY, INC.; *and* DAWN LAWSON, )<br><br>)<br>)<br>Defendants. )<br>_____ ) | Case No. 8:22-CV-1824 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1.     The United States brings this action to enforce the provisions of the Fair Housing Act, as amended ("FHA"), 42 U.S.C. §§ 3601 *et seq*.

2.     This action is brought under 42 U.S.C. § 3612(o) on behalf of Complainants Sherri Bannister, Tais Hannah, Kniia Coffee, and their respective children.  It is also brought under 42 U.S.C. § 3614(a).

**JURISDICTION AND VENUE**

3.     This court has jurisdiction over this action under 42 U.S.C. § 3612(o) and 3614(a), as well as 28 U.S.C. §§ 1331 and 1345.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the actions or omissions giving rise to the United States' claims occurred in the Middle District of Florida.

**THE SUBJECT PROPERTY AND THE DEFENDANTS**

5.     Concord Court is a 116-unit Low-Income Housing Tax Credit development located on West Concord Street in Orlando, Florida.  Concord Court is part of Amelia Court at Creative Village ("Creative Village"), an apartment community with approximately 256 residential units.  The Creative Village includes Concord Court as well as Amelia Court, an apartment tower located on West Amelia Street.  The residential units at Concord Court and Amelia Court and the associated common use areas and amenities at the properties are "dwellings" within the meaning of the FHA, 42 U.S.C. § 3602(b).

6.     Defendant Concord Court at Creative Village Partners, LTD, DBA Concord Court at Creative Village/Amelia Court at Creative Village ("Creative Village Partners") is a Florida Limited Partnership.  The partnership was established as Amelia Court at Creative Village Partners, LTD in 2015, and amended its Certificate of Limited Partnership to change its name to Concord Court at Creative Village Partners, LTD in 2018.  Creative Village Partners has two fictitious business names, Concord Court at Creative Village (registered in 2018) and Amelia Court at

Creative Village (registered in 2019).  At all times relevant to this lawsuit, Creative Village Partners has owned Concord Court's residential floors.

7.      Defendant SAS Concord Court at Creative Village Managers, LLC ("SAS Concord Court") is a Florida Limited Liability Company.  The company was established as SAS Amelia Court at Creative Village Managers, LLC in 2015, and amended its Articles of Organization to change its name to SAS Concord Court at Creative Village Managers, LLC in 2018.  SAS Concord Court has served as the General Partner of Creative Village Partners since its formation.  As the General Partner of Creative Village Partners, SAS Concord Court is responsible for managing the partnership and its day-to-day operations.

8.      Defendant Concord Management, LTD, DBA Concord Rents ("Concord Rents") is a Florida Limited Partnership established in July 1995.  Concord Management, LTD registered Concord Rents as its DBA in 2015, and continues to conduct business under this name.  At all times relevant to this lawsuit, Concord Rents managed Concord Court on behalf of Creative Village Partners, as well as the rest of the Creative Village.  Concord Rents manages a number of residential real estate properties in the State of Florida.

9.      Defendant Concord Management Company, Inc. ("Concord Management") is a Florida Corporation established in 1990.  Concord Management has served as the General Partner of Concord Rents since its formation.  As the General Partner of Concord Rents, Concord Management is responsible for managing the partnership and its day-to-day operations.

3

10.     Defendant Dawn Lawson was an employee of Concord Rents and managed Concord Court as its "Community Director" from January 2019 until October 2019.  Defendant Dawn Lawson also served as the property manager of Amelia Court.

## THE COMPLAINANTS

11.     Complainant Sherri Bannister is the mother of three children, Nazion Merriel (age 18), F.Q. (age 17), and E.H. (age 6).  Ms. Bannister and her three children lived in Apartment #308 at Concord Court from approximately June 22, 2019 until the spring of 2020.  At all times relevant to this lawsuit, Nazion Merriel was 15 to 16 years of age, F.Q. was 14 years of age, and E.H. was 3 years of age.

12.     Complainant Tais Hannah is the mother of three children, Tyeesha Ashby (age 18), C.T.A. (age 16), and C.E.A. (age 6).  Ms. Hannah, C.T.A., and C.E.A. lived in Apartment #408 at Concord Court from approximately June 27, 2019, until late October or early November 2019.  Tyeesha moved into Apartment #408 in September 2019, and resided in the unit with her family for the remainder of their tenancy.  At all times relevant to this lawsuit, Tyeesha Ashby was 15 years of age, C.T.A. was 13 to 14 years of age, and C.E.A. was 3 years of age.

13.     Complainant Kniia Coffee is the mother of J.A., who is currently around 16 years of age.  Ms. Coffee and J.A. moved into Apartment #233 at Concord Court on or about June 27, 2019, and continue to live at the property.  At all times relevant to this lawsuit, J.A. was between 13 and 17 years of age.

## FACTUAL ALLEGATIONS

**A. Defendants Denied Families with Children Equal Access to Their Homes By Providing Key Fobs Only to Adult Tenants but not to their Children or Other Minor Residents**

14.    At all times relevant to the complaint, residents of Concord Court used key fobs to access their apartment building, the elevators and stairwells, and the amenities at the Creative Village.

15.    From June 2019, when Concord Court first opened its doors for occupancy, through at least September 2019, Defendants had a policy of issuing key fobs to all adult tenants, but not to their children or other minors living with them.

16.    Tenants who requested additional key fobs for the minors living in their units were told by Defendant Lawson that they would not be issued to children and were reserved exclusively for adult leaseholders.  All adult residents at Concord Court were considered leaseholders and required to sign the lease.  Therefore, all adults at Concord Court received key fobs.

17.    The policy preventing minors from obtaining key fobs applied to all residents of the Creative Village, which includes Concord Court and Amelia Court.

18.    Because they did not have key fobs, children who were minors were forced to rely on the property's callbox system to gain entry to Concord Court.  The callbox could be programmed with the telephone numbers of tenants.  When operational, the callbox, which was also used by tenants' guests, permitted minor residents to dial telephone numbers that had been input into the system.  Upon

answering, the recipient of the call would then be able to grant them access to the apartment tower.

19.     The property's callbox was not consistently operational.   Moreover, minor residents could not make use of the callbox if they did not have a cell phone or the individuals they attempted to contact through the callbox were unable to answer their call.

20.     As a result of Defendants' refusal to issue key fobs to minor residents, children were frequently locked out of Concord Court, or could not reach the floors on which their apartments were located once inside of the building.

21.     Parents and guardians were concerned for their children's safety and compelled to rearrange their schedules to provide the children in their care with access to their units.   Some tenants left work and other commitments to let their children into the building, or decided not to pursue job opportunities that would require them to be away from home.   Tenants also coordinated with family members and other residents to ensure that the children would not be left waiting outside the property.

### Complainant Sherri Bannister

22.     Defendants issued one key fob to Ms. Bannister's household when her family moved into Concord Court in June 2019.   Ms. Bannister immediately informed Defendants that, without key fobs, her two teenage children, Nazion (age 15 and 16 at the time of tenancy) and F.Q. (age 14 at the time of tenancy) would have limited access to their unit.

23.     At the time, Ms. Bannister's teenage children did not have cell phones. Additionally, Ms. Bannister was enrolled in courses to become a paralegal, and planned to return to work that summer while continuing her education. After learning of Defendants' key fob policy, Ms. Bannister determined that she could not pursue employment because she needed to be available to help Nazion and F.Q. gain entry to their apartment.

24.     Nazion and F.Q. were locked out of Concord Court on several occasions. These issues persisted after Ms. Bannister purchased cell phones for her children in the hopes that they would be able to let themselves into the building using the callbox, which was often not operational, or call her when they could not enter the property.

25.     In August 2019, Ms. Bannister's 3-year-old daughter was hospitalized. During this period, Ms. Bannister had to make trips home to let her teenage children into Concord Court rather than staying at the hospital with her daughter because Nazion and F.Q. could not access the tower through the callbox system.

26.     Ms. Bannister characterizes Defendants' key fob policy as having forced her to choose between safeguarding the immediate welfare of her children and pursuing career opportunities that would allow her to build a better life for her family. Ms. Bannister's family left Concord Court in spring 2020.

**Complainant Tais Hannah**

27.     Ms. Hannah moved to Florida and into Concord Court in June or July of 2019. She received one key fob for her household. Ms. Hannah repeatedly asked Defendant Concord Rents' staff members, including Defendant Lawson, for another

key fob for her two teenage children, Tyeesha (age 15 at the time of tenancy) and C.T.A. (ages 13 and 14 at the time of tenancy). They consistently denied her requests.

28.     On most schooldays, Ms. Hannah had to meet Tyeesha and C.T.A. at Concord Court's entrance when they returned home from school to let them into the building and escort them up to their unit on the fourth floor. On multiple occasions, Ms. Hannah was away from the property and endeavoring to secure childcare and government services for her family in Florida when her children needed to access their unit. She had to come home to allow them into Concord Court.

### Complainant Kniia Coffee

29.     Ms. Coffee moved into Concord Court in June 2019 and received one key fob for her household, which included a teenage son, J.A. (age 13 at the time their tenancy began). Ms. Coffee repeatedly requested and on one occasion volunteered to pay for a key fob for J.A. Defendant Lawson rejected her offer.

30.     Ms. Coffee was employed in a customer service job and worked from the late morning into the evening every weekday. Because Defendants refused to issue a key fob to her son, Ms. Coffee had to coordinate with family and J.A.'s father to ensure that her son would not be locked out of Concord Court. A few times each week, Ms. Coffee arranged for a family member to be at the property with her key fob when J.A. came home, or asked J.A.'s father to pick him up from school and watch him until she could leave work.

31.     Ms. Coffee describes the experience of needing to plan ahead and rely on others to make sure that her son had the access he needed to their unit as having been "frustrating" and "a hassle."

32.     Defendants knew or should have known that their key fob policy limited the ability of minor residents, including the children of Ms. Bannister, Ms. Hannah, and Ms. Coffee, to access their units at Concord Court.  Defendants made no effort to modify the policy to accommodate families with children, however, until after Ms. Bannister filed a complaint against them with the United States Department of Housing and Urban Development ("HUD") in September 2019.

33.     On or around September 27, 2019, Defendants posted a notice on tenants' doors announcing that "[a]dditional key fobs [would] be made available [to residents] upon executing the attached agreement, completing an Addendum for Issuance of Keys with a member of [their] office team, and payment of a $25 deposit per key fob."

34.     The "attached agreement" referenced in the notice is a contract that all residents were required to sign to continue using the fitness center and clubhouse at Concord Court.

35.     As Defendants issued key fobs to all of Concord Court's adult residents, only tenants with children needed to comply with the requirements listed in Defendants' September 27, 2019 notice to secure key fobs for every member of their households.

**B. Defendants Required Minors to be Supervised at all Times in the Common Areas and Amenities of Concord Court and Accompanied by a Legal Guardian in the Clubhouse and Fitness Center**

36.     The on-site amenities available to residents of Concord Court and Amelia Court include a business center, a lounge with a billiards table ("clubhouse"), and a fitness center (collectively, the "Amenities").

37.     Concord Court also has hallways on each residential floor, a parking garage, and a lobby area on the first floor (collectively, the "Common Areas").

38.     Defendants made, printed, and published discriminatory statements that indicated a preference or limitation against families with children having full access to and enjoyment of the Common Areas and Amenities available to Concord Court's residents.

39.     Paragraph 18 of the lease contracts tenants entered into with Defendant Creative Village Partners to rent apartments at Concord Court provides:

> You and all guests and occupants must comply with any written apartment rules and community policies . . . . Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community[.]

40.     As an addendum to their lease contracts, tenants received a copy of Defendant Concord Rents' Resident Handbook, dated April 2019.  Tenants were required to sign the Resident Handbook and agree to adhere to its policies.  The Resident Handbook reiterated that these policies were "part of the Lease Contract and []subject to change with written notice to all residents."

41.     On or about August 2, 2019, Defendants posted a letter on the doors of their tenants' apartments at Concord Court.   This letter, which was drafted by Defendant Lawson and printed on Defendant Concord Rents' and Defendant Creative Village Partners' letterhead, stated: "All residents are responsible for their occupants, minors and guests and any violations of the rules and regulations could result in non-compliance and jeopardize your tenancy.  Minors are to be supervised at all times."

42.     This letter, which was given to all Defendants' tenants at Concord Court, modified the terms of Defendants' lease contracts to incorporate a requirement that children have adult supervision when outside their units.

43.     In September 2019, residents of Concord Court received another notice prepared by Defendant Lawson and printed on Defendant Creative Village Partners' letterhead.   This notice, titled "Review of Important Community Notifications," underscored that "[c]hildren are not to be left unattended without adult supervision in **ANY** area of the community."   The September 2019 notice also clarified that, with respect to the clubhouse and fitness center, the supervising adult needed to be the child's legal guardian.

44.     Defendants maintained the policy requiring minor residents to be supervised by an adult throughout Concord Court's Common Areas and Amenities ("the Supervision Policy") from at least August 2, 2019, until November 1, 2019.

45.     Defendants mandated that minor residents be accompanied by a legal guardian in the clubhouse and fitness center ("the Legal Guardian Policy") from at least September 2019 until November 1, 2019.

11

46.    The Supervision Policy and the Legal Guardian Policy applied to residents of Amelia Court as well as Concord Court.  Tenants of Amelia Court also received the August 2, 2019 letter and the September 2019 Review of Important Community Notifications drafted by Defendant Lawson.

47.    The Supervision Policy and the Legal Guardian Policy, which exclusively affected families with children, were not narrowly tailored rules that furthered legitimate, nondiscriminatory purposes.

48.    Defendant Concord Rents' staff members primarily enforced the Supervision Policy and the Legal Guardian Policy by instructing minors to return to their units or leave the Amenities if they were not accompanied by an adult or legal guardian. In some cases, Defendant Concord Rents' staff members threatened to contact law enforcement or told children that their families could be evicted for violating their lease because they were in the Common Areas.  For example, Ms. Bannister's child, F.Q., was told by Defendant Concord Rents' staff that their family could be evicted because they were speaking with another minor resident in the hallway.  Children in at least one other tenant's care were told by Defendant Concord Rents' staff that the police would be called if they did not return to their unit immediately.

49.    The Supervision Policy and the Legal Guardian Policy severely restricted families' enjoyment of the Creative Village, as children were effectively confined to their apartments when they were not accompanied by an adult resident.

50.     On separate occasions, Ms. Bannister's teenage children, Nazion and F.Q., were informed by Defendant Concord Rents' staff members that they could not talk with a friend in the hallway and needed to go inside their family's unit.

51.     Nazion wanted to exercise in the fitness center and attempted to do so multiple times.  During at least one of these visits, Defendant Concord Rents' staff directed Nazion to leave the fitness center because the adult resident he was with was not his parent or legal guardian.

52.     Defendant Concord Rents' staff members ordered other minors to leave the fitness center because the adult resident accompanying them was not a tenant of their unit.

53.     Ms. Bannister felt that Defendant Concord Rents' staff members treated her family "like prisoners," "lived to harass and bother the kids," and would not be satisfied unless her children did not leave their unit while at the property.

54.     After she filed her housing discrimination complaint with HUD in September 2019, Ms. Bannister forbade Nazion and F.Q. from using the Amenities because she was concerned about retaliation from or further conflicts with Defendant Concord Rents' staff members.

55.     Ms. Hannah's teenage children, Tyeesha and C.T.A., needed to use the equipment in the Creative Village's business center to complete their schoolwork, but were told on multiple occasions by Defendant Concord Rents' staff members that they could not do so without an adult.  Tyeesha and C.T.A. received similar warnings when they tried to access the fitness center/clubhouse area without supervision.

13

56.    Defendants did not rescind the Supervision Policy and the Legal Guardian Policy until at least November 1, 2019.

### C. Defendants Misrepresented the Availability of Apartments on Concord Court's Second Floor to Families with Children

57.    Defendants accepted and processed applications to lease apartments in the Creative Village several months in advance of Concord Court opening to tenants in late June 2019.

58.    Prospective tenants were required to list all members of their households, including their children, in their rental applications, which they submitted through an online portal available on the apartment community's website.  Defendants' website indicated that there would be units with patios and balconies in the Creative Village.

59.    Concord Court is five stories and includes 23 market rate and 93 affordable apartments on its second through fifth floors.  There are six one-bedroom units and 23 three-bedroom units on each of these four floors.  Only the apartments on Concord Court's second floor have balconies and patios.

60.    In the 2019 Extended Low-Income Housing Agreement that Defendant Creative Village Partners entered into with the Florida Housing Finance Corporation, Defendant Creative Village Partners agreed that 93 of Concord Court's 116 units would be set aside for households earning 80% or less of the Area Median Income ("AMI").    Defendants assessed and considered prospective tenants' income qualifications as part of the rental application process.

61.     Defendants also inquired about the composition of applicants' households, when they wanted to move into the Creative Village, and the size of apartment in which they were interested.  Accordingly, Defendants were made aware of which prospective tenants would have children living in their units in the ordinary course of the rental application process.

62.     In the spring of 2019, Defendants offered tours of the premises to prospective tenants.  These tours featured a model unit with a balcony on Concord Court's second floor.

63.     Tenants considered the units with patios and balconies to be more desirable than other apartments in Concord Court, especially because there are no outdoor common spaces in the Creative Village.  The second floor was also the lowest residential floor at Concord Court.  As a result, apartments on the second floor appealed to tenants with limited mobility who were concerned about their ability to leave and return to their units in the event of elevator outages at the property.

64.     Defendants exercised significant discretion over when as well as to which units tenant households were assigned.  Prospective tenants did not apply to lease specific apartments and were not informed of other available units in Concord Court before they received their housing assignments.

65.     Defendant Lawson was responsible for assigning tenant households to particular units in Concord Court.  The vast majority of tenant households were not assigned to apartments in Concord Court until the final weeks of June 2019.

66.     Defendants leased affordable, three-bedroom apartments on Concord Court's second and fourth floors for a median monthly rent of $1,344.  Units in this category on the third floor were leased to tenants for a median rent of $1,374/month.  Thus, tenants assigned to live in affordable, three-bedroom apartments on Concord Court's third and fourth floors likely would have been able to afford second floor units.

67.     Ms. Bannister met with Defendants to begin the rental application process in or around April 2019.  Ms. Bannister expressed to Defendants in the spring of 2019 that she would prefer to rent a three-bedroom apartment on the building's lowest residential floor.  Ms. Bannister wanted a unit on the lowest possible floor because she has a medical condition that impacts her feet and is exacerbated by overactivity.  Additionally, Ms. Bannister's daughter has a disability that limits her mobility, and Ms. Bannister hoped to avoid carrying her up and down multiple flights of stairs when the elevator was out of service.

68.     Defendants repeatedly represented to Ms. Bannister that apartments on the second floor were unavailable because they were reserved for tenants paying market rate rents.  These statements were inaccurate, as 13 units on the second floor were ultimately rented to tenants whose income was at or below 80% of AMI.

69.     Ms. Bannister's household was assigned to Unit #308, an apartment on Concord Court's third floor, on June 13, 2019.  On that day, there were three unassigned, three-bedroom units on the second floor, which Defendants eventually rented to tenants without children for $1,344/month.  Defendant Creative Village Partners leased Unit #308 to Ms. Bannister for $1,374/month.

16

70.     On the day her family moved into Unit #308, Ms. Bannister reiterated her request for an apartment on the second floor.  She also indicated that she would prefer a unit with a balcony.  Although multiple of the apartments described in the preceding paragraph remained unassigned, Defendant Lawson told her that the units on the second floor were exclusively for tenants paying market rate rents.

71.     In addition to Ms. Bannister's household, Defendants misinformed at least one other family with children that three-bedroom apartments on the second floor were reserved for tenants paying market rate rents, and later assigned these units to households without children for lower rents.

## HUD ADMINISTRATIVE PROCESS

72.     In the fall of 2019, Ms. Bannister, Ms. Hannah, and Ms. Coffee (collectively, the "HUD Election Complainants") timely filed housing discrimination complaints with HUD on behalf of themselves and their children.  These complaints, as amended, alleged, in part, that Defendants had discriminated against the HUD Election Complainants and their children on the basis of familial status in violation of the FHA.

73.     In accordance with 42 U.S.C. §§ 3610(a) and (b), the Secretary of HUD conducted and completed an investigation of each of the HUD Election Complainants' complaints, attempted conciliation without success, and prepared three final investigative reports.

74.     Based on the information gathered in the investigations, the Secretary determined, under 42 U.S.C. § 3610(g)(1), that reasonable cause existed to believe that

Defendants had engaged in illegal, discriminatory housing practices against each of the HUD Election Complainants on the basis of familial status.

75.     Therefore, in September 2021, the Secretary issued three Charges of Discrimination, under 42 U.S.C. § 3610(g)(2)(A), against Defendants on behalf of each of the HUD Election Complainants.

76.     In September and October 2021, Defendants made timely elections to have the claims asserted in the three Charges of Discrimination resolved in federal court, under 42 U.S.C. § 3612(a).

77.     On or about October 5, 2021, an Administrative Law Judge issued Notices of Election to Proceed in United States Federal District Court regarding each of the Charges of Discrimination and terminated the associated administrative proceedings.

78.     Following the Notices of Election, the Secretary of HUD authorized the Attorney General to commence civil action(s) related to the Charges of Discrimination, under 42 U.S.C. § 3612(o).

79.     On November 19, 2021, the United States received a referral from HUD under 42 U.S.C. § 3610(e)(2) regarding several additional housing discrimination complaints against Defendants, which involve similar allegations to the three Charges of Discrimination.

80.     The United States and Defendants have executed agreements suspending the running of any applicable statute of limitations for any cause of action under the FHA until October 6, 2022.

## COUNT I
### Fair Housing Violations on Behalf of Sherri Bannister

81.     The United States re-alleges and incorporates by reference the allegations set forth above.

82.     By their conduct described above, Defendants have:

    a.  Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling because of familial status, in violation of 42 U.S.C. § 3604(b);

    b.  Made, printed, published, or caused to be made, printed, or published statements with respect to the rental of a dwelling that indicated a preference, a limitation, or discrimination based on familial status, or an intention to make any such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c); and

    c.  Represented to a person because of familial status that a dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available, in violation of 42 U.S.C. § 3604(d).

83.     Ms. Bannister and her children are "aggrieved persons" as defined in 42 U.S.C. § 3602(i), and suffered injuries as a result of Defendants' conduct.

84.     Defendants' conduct described in the preceding paragraphs was intentional, willful, and taken in disregard for the rights of others.

## COUNT II
### Fair Housing Violations on Behalf of Tais Hannah

85.     The United States re-alleges and incorporates by reference the allegations set forth above.

86.     By their conduct described above, Defendants have:

    a.     Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling because of familial status, in violation of 42 U.S.C. § 3604(b); and

    b.     Made, printed, published, or caused to be made, printed, or published statements with respect to the rental of a dwelling that indicated a preference, a limitation, or discrimination based on familial status, or an intention to make any such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c).

87.     Ms. Hannah and her children are "aggrieved persons" as defined in 42 U.S.C. § 3602(i), and suffered injuries as a result of Defendants' conduct.

88.     Defendants' conduct described in the preceding paragraphs was intentional, willful, and taken in disregard for the rights of others.

## COUNT III
### Fair Housing Violations on Behalf of Kniia Coffee

89.     The United States re-alleges and incorporates by reference the allegations set forth above.

90.     By their conduct described above, Defendants have:

a.   Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling because of familial status, in violation of 42 U.S.C. § 3604(b); and

b.   Made, printed, published, or caused to be made, printed, or published statements with respect to the rental of a dwelling that indicated a preference, a limitation, or discrimination based on familial status, or an intention to make any such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c).

91.   Ms. Coffee and her son are "aggrieved persons" as defined in 42 U.S.C. § 3602(i), and suffered injuries as a result of Defendants' conduct.

92.   Defendants' conduct described in the preceding paragraphs was intentional, willful, and taken in disregard for the rights of others.

## COUNT IV
### Pattern or Practice Fair Housing Violations

93.   The United States re-alleges and incorporates by reference the allegations set forth above.

94.   Defendants' conduct described above constitutes:

a.   A pattern or practice of resistance to the full enjoyment of rights granted by the FHA, in violation of 42 U.S.C. § 3614(a); and

b.   A denial to a group of persons of rights granted by the FHA which raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

95.   Defendants may have implemented the policies referenced in the

allegations set forth above at properties they own or manage apart from Concord Court and Amelia Court.

96.    In addition to Ms. Bannister, Ms. Hannah, Ms. Coffee, and their children, there are other victims of Defendants' discriminatory actions and practices who are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and may have suffered damages as a result of Defendants' conduct.  These aggrieved persons may include families with children that resided at Concord Court as well as Amelia Court.

97.    Defendants' conduct described above was intentional, willful, and taken in disregard for the rights of others.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that the Court enter an ORDER that:

1. Declares that Defendants' discriminatory policies and practices, as alleged above, violate the FHA;

2. Enjoins Defendants, their representatives, agents, employees, successors, and all others in active concert or participation with them from:

    (a) Discriminating against any person on the basis of familial status in violation of the FHA in any aspect of the rental of a dwelling;

    (b) Failing or refusing to take such affirmative steps as

may be necessary to restore, as nearly as practicable, the victims of the Defendants' unlawful practices to the position they would have been in but for the discriminatory conduct; and

(c) Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future, and to eliminate, to the extent practicable, the effects of the Defendants' unlawful practices;

3. Awards appropriate monetary damages to the HUD Election Complainants and their children, as well as to all other persons harmed by Defendants' discriminatory conduct, as authorized by 42 U.S.C. §§ 3612(o)(3), 3613(c)(1), and 3614(d)(1)(B); and

4. Assesses civil penalties against Defendants under 42 U.S.C. § 3614(d)(1)(C) to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

## **JURY DEMAND**

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 6, 2022

Respectfully submitted,

MERRICK GARLAND
Attorney General

KRISTEN CLARKE                          ROGER B. HANDBERG
Assistant Attorney General              United States Attorney
Civil Rights Division

*/s/ Jaclyn A. Harris*                  */s/ Yohance A. Pettis*
SAMEENA SHINA MAJEED, Chief             YOHANCE A. PETTIS
MICHAEL S. MAURER, Deputy Chief         FL Bar No. 021216
JACLYN A. HARRIS                        Deputy Chief, Civil Division
CA Bar No. 313793                       United States Attorney's Office
Trial Attorney                          Middle District of Florida
U.S. Department of Justice              United States Attorney's Office
Civil Rights Division                   Middle District of Florida
Housing and Civil Enforcement Section   400 North Tampa St., Suite 3200
950 Pennsylvania Ave, 4CON              Tampa, FL 33602
Washington, DC 20530                    Facsimile: (813) 274-6198
Telephone: (202) 305-5944               Yohance.Pettis@usdoj.gov
Facsimile: (202) 514-1116
Michael.Maurer@usdoj.gov
Jaclyn.Harris@usdoj.gov


Attorneys for Plaintiff
United States of America